# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| GUY M. LACROSSE, individually, and as a representative of a Class of Participants and Beneficiaries of the Jack Henry & Associates, Inc., Savings/Retirement Plan,<br><br>    Plaintiff,<br><br>    v.<br><br>JACK HENRY & ASSOCIATES, INC., UNDER 29 U.S.C. § 1132(a)(2)<br><br>    and<br><br>JACK HENRY & ASSOCIATES, INC. SAVINGS/RETIREMENT PLAN,<br><br>    Defendants. | Case No.: |

## CLASS ACTION COMPLAINT

Plaintiff, Guy M. Lacrosse, individually and on behalf of all other similarly situated participants in and beneficiaries of the Jack Henry & Associates, Inc., Savings/Retirement Plan (the "Class"), by his undersigned counsel, brings this class action complaint against the defendants listed herein:

## INTRODUCTION

1.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise

of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.      The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3.      The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015)).

4.      Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530). "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5.      Defendants, Jack Henry & Associates, Inc. ("Jack Henry") and the Jack Henry & Associates, Inc., Savings/Retirement Plan (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary oversight, authority, or control over the 401(k) defined contribution pension plan – known as the Jack Henry & Associates, Inc., Savings/Retirement Plan (the "Plan" or "Jack Henry Plan") – that it sponsors and provides to its employees.

6. During the putative Class Period (September 25, 2017, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to pay excessive recordkeeping and administrative (RKA) fees.

7. These objectively unreasonable RKA fees cannot be contextually justified and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

8. Defendants breached their fiduciary duty of prudence by causing the Plan participants to pay excessive RKA fees. Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan RKA and managed account services.

9. ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

10. The unreasonable RKA fees paid inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

11. These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

12. To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches of the duty of prudence.

3

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

14.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

15.    Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

16.    In conformity with 29 U.S.C. § 1132(h), Plaintiff served the original Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

17.    Plaintiff, Guy M. Lacrosse, is a resident of the State of Kansas and currently resides in Overland Park, Kansas, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

18.    Plaintiff started at Jack Henry in June 2018 and is still currently employed with Defendants.

19.    Plaintiff joined the Plan on November 30, 2018, is a current Participant of the Plan, and paid excessive RKA fees during the Class Period and during his participation in the Plan.

20.    Plaintiff has Article III standing as a current Plan participant to bring this action on behalf of the Plan because he suffered actual injuries to his own Plan account

through paying excessive RKA fees to Prudential Retirement during the Class Period, that injury is fairly traceable to Defendants' failure to have either 1) negotiated reasonable fees with Prudential (which they would have agreed to had the fiduciaries followed the standard of care and created a competitive environment); or 2) switched to a different recordkeeper if prudential did not accept a reasonable fee. The harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

21. Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injuries.

22. The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive RKA fees) necessary to understand that Defendants breached their fiduciary duty of prudence until shortly before this suit was filed.

23. Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

24. Jack Henry & Associates, Inc. ("Jack Henry") is a financial technology provider. Jack Henry & Associations, Inc. is the Plan Sponsor under 29 U.S.C. § 1002(16)(A)(i). *See* Part 2a and 3a of the Plan's Form 5500 for 2019. It is headquartered in Monett, Missouri, at 309 E. Cleveland Avenue, Monett, Missouri 65708. In this Complaint, "Jack Henry"

refers to the named Defendants and all parent, subsidiaries, related, predecessor, and successor entities to which these allegations pertain.

25.     Jack Henry, as Plan Sponsor, acted through its officers, including through the individual members of the Jack Henry and Associates Savings/Retirement Plan Advisory Committee, to perform Plan-related fiduciary functions in the course and scope of their business. Jack Henry had a duty to appoint and oversee those appointees, and accordingly had a concomitant fiduciary duty to monitor, supervise, and remove those appointees under appropriate circumstances. For these reasons, Jack Henry is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

26.     The Plan Administrator is the Savings/Retirement Advisory Committee. As the Plan Administrator, Advisory Committee Defendants are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Advisory Committee Defendants have exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

27.     The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that Jack Henry's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

28.     From 2017 to 2022, the Plan had about $960,000,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding

Plan fees and expenses. Defendants, however, did not regularly monitor Prudential Retirement to ensure that they remained the prudent and objectively reasonable choices as Plan service providers.

**ERISA'S FIDUCIARY STANDARDS IN THE**
**DEFINED CONTRIBUTION INDUSTRY**

29.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

30.     Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

31.     Although Jack Henry contributed employer-matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping or managed account fees or other types of Plan expenses.

32.     While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are a significant factor that affect plan participant's investment returns and impact their retirement income.

33.     According to the United States Department of Labor, Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the

level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices. *See* United States Department of Labor, Employee Benefit Security Administration, *Meeting Your Fiduciary Responsibilities*, 12 at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf (last visited Aug. 11, 2022) (hereinafter "DOL Fiduciary Publication") ("If you are hiring third-party service providers, have you looked at a number of providers, given each potential provider the same information, and considered whether the fees are reasonable for the services provided?").

<u>Recordkeeping Services</u>

34.     Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed service offerings that can meet all the needs of mega retirement plans. Prudential Retirement is one such recordkeeper.

35.     These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard offerings of the same level and quality as other recordkeepers who service mega plans.

36.     The fees charged by recordkeepers for RKA services are impacted by 1) the costs of providing the RKA services; 2) the competitive environment related to what other recordkeepers would charge to provide materially identical services; and 3) the revenues that a recordkeeper can generate from both the recordkeeping fees as well as other ancillary

revenue including, but not limited to, the potential to manage proprietary investment options in the plan.

37.     Providing RKA services involves both fixed and variable costs. The more participants in a plan, the greater proportion of the costs are variable costs which, in turn, means the closer the average cost per participant approaches the variable cost per participant.

38.     All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide identical RKA services to maintain the same profit margin rate.

39.     As a result, it is axiomatic in the retirement plan services industry that the more participants in a plan, the lower the effective RKA fee per participant the plan can negotiate. All prudent plan fiduciaries and their consultants and advisors are aware of this industry dynamic.

40.     There are two types of essential RKA services provided by all recordkeepers. The first type, "Bundled RKA" services, include:

    a.    Recordkeeping;

    b.    Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

    c.    Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

    d.    Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.    Maintenance of an employer stock fund;

f.    Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.    Plan consulting services including assistance in selecting the investments offered to participants;

h.    Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i.    Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j.    Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

k.    Trustee / custodian services.

41.    The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These "A La Carte RKA" services typically include the following:

a.    Loan processing;

b.    Brokerage services/account maintenance;

c.    Distribution services; and

d.    Processing of Qualified Domestic Relations Orders (QDROs).

42.    In practice, there are no material differences between the services that are offered and provided by national recordkeepers, like Prudential Retirement.  Rather, some recordkeepers *may* differ slightly in *how* they deliver the services.

10

43.     As an example, because the RKA offerings are materially identical among all recordkeepers who provide services to plans, like the Jack Henry Plan, it is the standard and prevailing practice for retirement plan consultants and advisors (experts in the retirement plan industry) to request quotes by asking what the recordkeeper's revenue requirement is on a per participant basis for providing the Bundled RKA services.

44.     Similarly, in most cases differences in fee rates for the A La Carte services are immaterial in determining the total fees charged by recordkeepers. To the extent that some recordkeepers have charged higher fees for these services, when those recordkeepers are in a competitive situation (in which they may not win the business), they will often reduce their A La Carte fee rates to be reasonable and competitive with what others are charging.

45.     The same is true for the Bundled RKA fee rates charged by recordkeepers. As a result, the standard of care for prudent plan fiduciaries and retirement plan consultants and advisors is to use the Bundled RKA fee rate of different recordkeepers to make fee rate comparisons and determine whether the Bundled RKA fee rate is reasonable.

46.     This approach is validated by the structure of the request for proposals ("RFPs") sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

47.     For mega plans, like the Jack Henry Plan, any immaterial variations in the way certain services are received by one plan compared to another plan have an immaterial impact on the reasonable market rate for Bundled RKA services.

48. As a result, comparisons of the fees paid by similar sized plans are meaningful and provide a reasonable basis for determining whether an inference of imprudence is warranted based on the RKA fees being paid by any specific plan.

49. Additionally, any minor variation in the level and quality of Bundled RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

50. Since well before 2015, industry experts have maintained that for mega retirement plans like the Jack Henry Plan, prudent fiduciaries treat Bundled RKA services as a commodity when negotiating with recordkeepers. "Custody and recordkeeping are 'commodity' services. Like any commodity, given materially equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

51. When required by prudent plan fiduciaries, all national recordkeepers (including Prudential) will quote fees for the Bundled RKA services for Mega plans on a per participant basis without regard for any potential minor plan-specific differences in the requested services, which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RKA services.

52. Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

53.     Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

54.     The June 29, 2023 Required Disclosure Information for the Jack Henry & Associates, Inc., Savings/Retirement Plan (ERIS Section 404(a)(5) participant fee disclosures) states in pertinent part that "Plan administrative fees may include recordkeeping, legal, accounting, and other costs associated with maintaining the Plan." These are materially identical services provided by other recordkeepers who service plans like the Jack Henry Plan.

55.     By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA was stable for mega plans, including the Jack Henry Plan. Reasonable recordkeeping fees paid in 2018 are representative of the reasonable fees during the entire Class Period.

56.     The investment options selected by plan fiduciaries often also have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

57.     Collecting a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund is known as "revenue sharing" or "indirect compensation."  The Jack Henry Plan paid its Plan services providers both direct and indirect compensation.

58.     The amount of compensation paid to Plan service providers must be *reasonable* (not the cheapest or the average in the market).

## THE PLAN

59.     During the entire Class Period, the Plan received RKA services from Pruden-

tial Retirement.

60.     The RKA were excessive relative to the level and quality of RKA received since

the same level and quality of services are provided to all mega plans, like the Jack Henry

Plan, and any minor variation with respect to the use of components of the standard offering

1) do not impact the Bundled RKA rates; and 2) are virtually always immaterial as it relates

to the Total RKA rates and cannot reasonably explain the disparity between what the Plan

paid and the market rate for the services received.

61.     This is true regardless of the specific service codes listed by the plan on the

Form 5500. *See* Droblyen, *supra*.  For example, all recordkeepers provide communications

to plan participants but Prudential Retirement did not list service code "38 Participant com-

munication" in the Plan's Form 5500.

62.     These excessive Plan RKA fees led to lower net returns than the rates enjoyed

by participants in comparable 401(k) plans.

63.     During the Class Period, Defendants breached their duty of prudence to the

Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively

unreasonable fees for RKA.

64.     Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan

participants and their beneficiaries, breached their fiduciary duties of prudence in violation

of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the

Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES
## SELECTING & MONITORING RECORDKEEPERS

65. Prudent plan fiduciaries ensure they are paying only reasonable fees for RKA by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dol-gov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-re-tirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Once you have a clear idea of your requirements, you are ready to begin receiving estimates from prospective providers. Give all of them complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

66. Prudent plan fiduciaries can easily receive a quote from other recordkeepers and determine if their current level of RKA fees is unreasonable in light of the level and quality of RKA services. It is not a cumbersome or expensive process.

67. It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and com-pared to plans of similar size and type that are receiving analogous services. While each

15

plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

68.    Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and quality of services for a more competitive reasonable fee if necessary.

69.    A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated RKA fees. To receive a truly "reasonable" RKA fee in the prevailing market, the standard for prudent plan fiduciaries is to engage in solicitations of competitive bids on a regular basis.

70.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

71.    Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

72.    Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

16

73. Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market.

## PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RKA FEES AND THE PLAN PAID UNREASONABLE RKA FEES

74. A plan fiduciary must continuously monitor its RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable or negotiate a new lower fee with the incumbent. *See Hughes*, 142 S. Ct. at 742.

75. During the Class Period, Defendants failed to regularly monitor the Plan's Bundled RKA fees paid to recordkeepers, including, but not limited to, Prudential Retirement.

76. During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including, but not limited to, Prudential Retirement, in order to avoid paying unreasonable RKA fees.

77. During the Class Period, Defendants followed a fiduciary process that was imprudent given the objectively unreasonable RKA fees it paid to Prudential Retirement, in light of the level and quality of RKA services it received.

78. As set forth in the table below, from the years 2017 through 2022, based upon information provided by the Plan fiduciaries to Plan participants in the Jack Henry plan participant fee disclosures under Section 404(a)(5), the Plan paid an effective average annual RKA fee of approximately $78 per participant. These amounts are the total RKA fees derived from the Plan's Form 5500s.

17

#### Total Recordkeeping and Administration (Total RKA) Fees

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Average |
|---|---|---|---|---|---|---|---|
| Participants | 6,760 | 7,205 | 7,374 | 7,641 | 7,707 | 8,097 | 7,464 |
| Est. Total RKA Fees | $430,429 | $604,873 | $577,497 | $622,653 | $709,926 | $549,835 | $582,536 |
| Est. Total RKA Per Participant | $64 | $84 | $78 | $81 | $92 | $68 | $78 |

79. The table below illustrates the annual Total RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of RKA services (that all mega plans receive from recordkeepers), compared to the average annual Total RKA fees paid by the Plan (as identified in the table above).

#### Comparable Plans' Total RKA Fees Based on Publicly Available Information from Form 5500

(Price calculations are based on 2018 Form 5500 information)

| Plan | Partici-pants | Assets | Total RKA Fee | Total RKA Fee /pp | Record-keeper |
|---|---|---|---|---|---|
| Hitachi Vantara Corporation Retirement and Savings Program | 3,890 | $680,441,899 | $174,568 | $45 | Fidelity |
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $500,178,777 | $278,907 | $45 | Great-West |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $285,814 | $45 | T. Rowe Price |
| Jack Henry Plan 2018 Fee | 7,205 | $733,320,751 | $604,873 | $84 | Prudential |
| The Boston Consulting Group, Inc. Employees' Savings Plan and Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $904,717,349 | $322,496 | $36 | Fidelity |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West |

80.    The comparator plans identified above received the materially same level and quality of RKA services as provided by Prudential Retirement but paid much lower RKA fees.

81.    The graph below illustrates the annual Total RKA fees paid in 2018 by other comparable plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of services, compared to the annual Total RKA fees paid in 2018 paid by the Plan in 2018 (as identified in the table above), with the white data points representing RKA fees that recordkeepers offered to (and were accepted by) comparable Plans.



82.    As noted above, prior to the Class Period, the fees Recordkeepers were willing to accept had largely stabilized such that fees the Recordkeepers were accepting in 2018 for

RK&A services were consistent with the fees Recordkeepers would accept prior to and throughout the entire Class Period.

83.    The more participants a plan has, the lower the effective fee per participant fee rate that recordkeepers are willing to provide. The trend line in the graph represents a per participant fee rate for a given number of participants around which a plan fiduciary would expect to receive initial bids for the RKA services.

84.    The disparity between the fees paid by the Plan and the fees paid by the comparable plans identified above cannot be plausibly explained by immaterial service disparities since there are no material differences in the RKA services provided to plans as large as the Plan and the comparable plans.

85.    The table and graph above illustrate that in 2018 the Plan paid Total RKA fees of $84 per participant which is much higher than the Total RKA fees paid by the other comparable plans in 2018.

86.    When a plan fiduciary follows prudent practices as outlined by the Department of Labor and solicits bids from several recordkeepers in a competitive environment, some initial bids for the RKA services would be below the trend line and others would be above the trend line. Ultimately, a prudent plan fiduciary should be able to negotiate a Bundled RKA fee lower than the trend line such that the Total RKA fee would be proximate to the trend line.

87.    The table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual Total RKA fee of around $39 per participant, if not lower.

20

88.     From the years 2017 through 2022, and as compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting with prudence, the Plan actually would have paid significantly less than an average of approximately $582,536 per year in Total RKA fees, which equated to an effective average of approximately $78 per participant per year.

89.     From the years 2017 through 2022, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for RKA of approximately $291,096 per year in fees, which equates to approximately $39 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not allow plan participants to pay approximately *twice* as much as a reasonable fee for RKA services.

90.     From the years 2017 to 2022, and because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of services, the Plan cost its participants a total minimum amount of approximately $1,748,637 in unreasonable and excessive Total RKA fees.

91.     From the years 2017 to 2022, because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under manage-

ment, receiving a materially identical level and quality of services, the Plan cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $2,299,327 in Total RKA fees.

92. Defendants could have received RKA services during the Class Period of the same level and quality from Prudential Retirement or other recordkeepers that provide recordkeeping services to mega plans, like the Jack Henry plan, because both the Plan 5500 forms and Plan fee disclosures to participants and plan sponsors establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above.

93. Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, reasonable tradeoffs did not exist because all recordkeepers were providing a materially identical level or quality of services and the Plan could have received materially identical services from national recordkeepers other than Prudential for a lower fee, or negotiated with Prudential to accept a reasonable fee, had they adhered to the standard of care for prudent plan fiduciaries.

94. Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeepers, Prudential Retirement, and Defendants could have obtained the same RKA services for less.

22

95.     Plaintiff paid these excessive RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to his Plan account as a result of paying these excessive fees.

96.     During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RKA fees it paid to Prudential Retirement vis-à-vis the fees that other RKA providers would charge, and would have accepted, for the same level and quality of services.

97.     During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's RKA fees it paid to Prudential Retirement, but Defendants either simply failed to do so, or did so ineffectively, given that it paid *over twice* the RKA fees than it should have.

98.     During the entirety of the Class Period, had Defendants engaged in regular and/or reasonable examination and competitive comparison of the RKA fees they paid to Prudential Retirement,  they would have realized that the Plan was compensating Prudential Retirement unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants, and therefore should have removed Prudential Retirement as Plan recordkeeper.

99.     The Plan RKA fees were also excessive relative to the RKA services received under the 2022 Jack Henry & Associates, Inc.'s Participant and Sponsor Fee Disclosures, since the quality and level of such services are standard for mega 401(k) plans like this Plan

and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. Any difference in recordkeeping fees between the Plan and the comparable plans is not explained by the level and quality of services each recordkeeper provides.

100. The market for RKA services for mega plans, like the Jack Henry Plan, is such that all national recordkeepers can provide all the required services that a mega plan might need. Any differences in the quality or scope of the services delivered are immaterial to the difference between what the Plan paid for Bundled RKA services and what the reasonable fair market fee was for identical services.

101. During the entirety of the Class Period, and by failing to recognize that the Plan and its participants were being charged much higher and unreasonable RKA fees than they should have been, and/or by failing to take effective remedial actions including potentially removing Prudential Retirement as the Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiff and Plan participants, causing millions of dollars of harm to Plaintiff and Class Member's retirement accounts.

## CLASS ACTION ALLEGATIONS

102. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

103. Plaintiff brings this action individually and on behalf of all others similarly situated as a class action pursuant to the provisions of Rule 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure.

24

104. In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Jack Henry & Associates, Inc., Savings/Retirement Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning June 27, 2016 and running through the date of judgment.

105. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The Class includes over 7,000 members and is so large that joinder of all its members is impracticable.

106. **Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** Numerous common questions of law and fact exist as to Plaintiff and the other Class members because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

    a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

    b. Whether Defendants breached their fiduciary duties to the Plan;

    c. What are the losses to the Plan resulting from each breach of fiduciary duty; and

    d. What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

107. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the Class because Plaintiff was a Participant in the Plan during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

108. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**

Plaintiff will adequately represent the Class because he was a Participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

109. **Risk of Inconsistent/Dispositive Adjudications – Federal Rule of Civil Procedure 23(b)(1).** Certification is appropriate, because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

110. **Declaratory and Injunctive Relief - Federal Rule of Civil Procedure 23(b)(2).** Certification is appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

111. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and each of the other

Class members are small compared to the burden and expense that would be required to individually litigate their claims against Defendants, thus rendering it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefit of single adjudication, economy of scale, and comprehensive supervision by a single court.

112. Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

113. The claims brought by Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts, and thus internal exhaustion of these claims are not required.

### FIRST CLAIM FOR RELIEF
### Breach of ERISA Duty of Prudence

114. Plaintiff restates the above allegations as if fully set forth herein.

115. Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

116. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in their administration of the Plan.

117. Defendants, as fiduciaries of the Plan, are responsible for selecting a record-keeper that charges objectively reasonable RKA fees.

118.     During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

119.     During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

120.     During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeepers to make sure they were providing the RKA services at reasonable costs, given the highly competitive market surrounding RKA services and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeepers if they provided RKA services at objectively unreasonable costs.

121.     During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeepers critically or objectively in comparison to other recordkeeper options.

122.     Through these actions and omissions, Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

123.     Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the

28

conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

124. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, Plaintiff and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

125. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Jack Henry Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

<u>SECOND CLAIM FOR RELIEF</u>
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**

126. Plaintiff restates the above allegations as if fully set forth herein.

127. Defendants had the authority to appoint, oversee, and remove members or individuals responsible for Plan RKA fees on the Advisory Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

128. In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan RKA fees on the Advisory Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

129. Defendants had a duty to ensure that the individuals responsible for RKA services on the Advisory Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties);

had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant Jack Henry.

130. The objectively unreasonable and excessive RKA fees paid by the Plan inferentially suggest that Defendants breached their duty to monitor by, among other things:

    a. Failing to monitor and evaluate the performance of individuals responsible for Plan RKA fees on the Advisory Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably RKA expenses;

    b. Failing to monitor the process by which the Plan's recordkeepers, Prudential Retirement, were evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

    c. Failing to remove individuals responsible for Plan RKA fees on the Advisory Committee whose performance was inadequate in that these individuals continued to pay the same RKA fees even though solicitation of competitive bids would have shown that maintaining Prudential Retirement as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of Plaintiff and Plan participants' retirement savings.

131. As the consequences of the foregoing breaches of the duty to monitor for RKA fees, Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

132. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Jack Henry Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RKA fees on the Advisory Committee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants

on all claims and requests that the Court award the following relief:

A.     A determination that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's attorneys as Class Counsel;;

B.     A Declaration the Defendants are Plan fiduciaries and have breached their fiduciary duties under ERISA;

C.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable RKA and managed account fees, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.     An Order requiring Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(2) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Defendants as necessary to effectuate relief, and to prevent Defendants' unjust enrichment;

E.     An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

F.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

G.     An award of pre-judgment interest;

H.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.     Such other and further relief as the Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and all others similarly situated, respectfully demands a trial by jury.

Dated this 9th day of October, 2023

Respectfully submitted,

*/s/ Greg G. Gutzler*
Greg G. Gutzler
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, New York  10017
646-933-1000
ggutzler@dicellolevitt.com

Adam J. Levitt
Daniel R. Ferri
Blake Stubbs
DICELLO LEVITT LLP
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois  60602
312-214-7900
alevitt@dicellolevitt.com
dferri@dicellolevitt.com
bstubbs@dicellolevitt.com

Timothy F. Devereux
Jeffrey S. Gibson
WAGNER REESE, LLP
11939 North Meridian Street, Suite 100
Carmel, Indiana  46032
317-569-0000
TDevereux@WagnerReese.com
JGibson@WagnerReese.com

Jacob Rusch
Timothy Becker
JOHNSON BECKER, PLLC
444 Cedar Street, Suite 1800
Saint Paul, Minnesota  55101
800-272-6386
Jrusch@johnsonbecker.com
Tbecker@johnsonbecker.com

*Counsel for Plaintiff and the Proposed Class*